IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MEMPHIS COMMUNITY AGAINST )
POLLUTION, INC., PROTECT OUR )
AQUIFER, and SIERRA CLUB )
                 )
       Plaintiffs, )
                 )    Case No. 2:21-cv-02201-JTF-atc
      v. )
                 )
UNITED STATES ARMY CORPS )
OF ENGINEERS, an agency of the United States )
Department of Defense, and LT. GEN. SCOTT )
SPELLMON, in his official capacity )
as Chief of Engineers and Commanding )
General of the U.S. Army Corps of Engineers, )
                 )
       Defendants. )

**FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**Introduction**

1.     The Byhalia pipeline is an approximately 50-mile, 24-inch diameter, high-pressure crude oil pipeline which routes through predominantly Black, low-income neighborhoods in southwest Memphis, Tennessee, before entering Mississippi where it turns east and then north. The pipeline would transport crude oil underground, atop the Memphis Sand Aquifer, which supplies drinking water to nearly one million people in the Memphis area. Along its path, the pipeline plows through a drinking water wellfield that serves southwest Memphis neighborhoods.

2.     Because the proposed crude oil pipeline would also cross over 130 streams and wetlands in Tennessee and Mississippi, its construction requires a permit under Section 404 of the Clean Water Act from the United States Army Corps of Engineers. Section 404 permits are

required to discharge dredged or fill material into waters of the United States. In early 2021, the Corps verified the use of a fast-track general permit called Nationwide Permit 12 for construction of the pipeline. The version of Nationwide Permit 12 relevant here was issued in 2017.

3.    The Corps' authorization of activities through Clean Water Act permits requires compliance with the National Environmental Policy Act. That statute, in turn, requires federal agencies to assess and disclose the environmental effects of their actions and to involve the public in their decision-making. When the Corps issued Nationwide Permit 12 in 2017, it predicted that the permit would be used to authorize 69,700 activities over the five-year life of the permit. The Corps did not know what those activities would be or where they would be located. Nevertheless, when the Corps issued Nationwide Permit 12 in 2017, it purported to satisfy all of its environmental analysis obligations under the National Environmental Policy Act for all of the 69,700 activities that would be authorized under that permit. Unbeknownst to the Corps at the time, those activities would ultimately include the Byhalia pipeline.

4.    In 2016, when the Corps took public comment on its proposed issuance of Nationwide Permit 12, West Tennessee and North Mississippi communities had no idea that years later a company would try to put a high-pressure crude oil pipeline next to their homes, through streams in their neighborhoods, and over their drinking water source. Yet because the Corps attempted to satisfy all of its National Environmental Policy Act public participation obligations at that time, the only opportunity for these communities to voice their concerns to the Corps regarding the Byhalia pipeline happened years before the pipeline was proposed.

5.    Byhalia Pipeline LLC is a joint venture between Valero Energy Corporation and Plains All American Pipeline—one is a Fortune 100 company, the other a subsidiary of a Fortune 100 company. The Byhalia pipeline would connect the Diamond pipeline, which transports crude

oil from Oklahoma to Memphis, to the Capline pipeline, which is being reversed to allow oil to flow north-to-south toward the Gulf of Mexico.

6.     Byhalia Pipeline LLC considered several routes to connect the Diamond and Capline pipelines. The route the company ultimately selected takes a circuitous path through southwest Memphis. Southwest Memphis has high rates of poverty. Over 97 percent of the area's residents are Black. While attempting to negotiate easements from landowners, a land agent for Byhalia Pipeline LLC identified the selected route as the "point of least resistance." The company is now seeking to take land from unwilling landowners through eminent domain.

7.     Decades of environmental injustice have imposed dramatically disproportionate pollution burdens and health effects on the southwest Memphis community. Pollution sources in the community include an oil refinery, a steel mill, a recently retired coal-fired power plant, and a new natural gas plant. Residents of southwest Memphis suffer a cumulative cancer risk of four times the national average.

8.     The Byhalia pipeline would travel above the Memphis Sand Aquifer, including through a municipal wellfield that provides drinking water for southwest Memphis residents. The aquifer supplies Memphis and surrounding areas with clean, reliable drinking water, and it supplies water used by numerous industries and agricultural producers throughout West Tennessee and North Mississippi. The aquifer is the sole source of drinking water in Memphis, the largest city in the United States that acquires all of its drinking water from groundwater. If the aquifer becomes polluted by an oil spill, the consequences for communities in Memphis, West Tennessee, and North Mississippi could be disastrous.

9.     The Corps issues two types of Section 404 permits: individual permits and general permits. Approving the pipeline using a project-specific individual permit would require the Corps

to consider and disclose the effects of the pipeline on southwest Memphis and North Mississippi communities—including cumulative effects associated with repeatedly siting industrial infrastructure in certain areas—as well as effects on the Memphis Sand Aquifer and other resources. The Corps would also have to solicit public comment under the National Environmental Policy Act and Clean Water Act.

10.     General permits like Nationwide Permit 12 strike a tradeoff. Activities approved under general permits are generally not subject to project-specific analysis and public comment, but they must be limited to only routine activities with minimal individual and cumulative environmental impacts. In recent years, the Corps has relied on Nationwide Permit 12, which applies to the sprawling category of "utility line activities," to authorize new construction of oil and gas pipelines hundreds of miles in length with thousands of individual water crossings causing various impacts to communities across America. For perspective, other nationwide permits authorize activities like installing crab traps or duck blinds.

11.     The Corps' attempt to satisfy its National Environmental Policy Act and Clean Water Act obligations in 2017 for all activities that would be authorized under Nationwide Permit 12 over its five-year lifespan falls woefully short. The Corps arbitrarily dismissed unassessed and undefined impacts as insignificant, acknowledged that pipeline spills and contributions to greenhouse gas emissions were "reasonably foreseeable" results of its action but declined to analyze them, masked significant cumulative impacts by comparing them to centuries of human activity, and failed to analyze any environmental justice impacts at all. The Corps' analysis is insufficient to support its finding of no significant impact under the National Environmental Policy Act and minimal-impacts finding necessary for general permits under the Clean Water Act.

12.    The Corps' Clean Water Act regulations also require it to consider the public interest in permitting decisions. To the extent the Corps did so in connection with the Byhalia pipeline, its public interest determination is arbitrary and capricious.

13.    Memphis Community Against Pollution, Sierra Club, and Protect Our Aquifer seek a declaration that the Corps' issuance of Nationwide Permit 12 in 2017, its verification of the use of that permit for the Byhalia pipeline, and its continuing failure to supplement its environmental analysis violates the National Environmental Policy Act and the Clean Water Act, exceeds the Corps' statutory authority, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. They additionally request that the court vacate all approvals under Nationwide Permit 12 for the Byhalia pipeline and enjoin its future use for that project.

## Jurisdiction and Venue

14.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"); the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. ("NEPA"); and the Clean Water Act, 33 U.S.C. § 1251 *et seq*. This Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief).

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because at least one of the verifications for the Byhalia pipeline was issued by the Memphis District of the United States Army Corps of Engineers ("the Corps") which is located in the Western District of Tennessee and because a substantial part of the events or omissions giving rise to the claim occurred in the District. Assignment to the Western Division is appropriate because Memphis

Community Against Pollution and Protect Our Aquifer reside in the Division and the claims arose in the Division. LR 3.3(b)(3).

## Parties

### Memphis Community Against Pollution

16.    Plaintiff Memphis Community Against Pollution is a not-for-profit corporation founded in October 2020 and incorporated in March 2021. It is headquartered in Memphis, Tennessee.

17.    Memphis Community Against Pollution brings this action on its own institutional behalf and on behalf of its supporters in West Tennessee. Memphis Community Against Pollution's supporters include a four-member leadership committee and at least seventy local community members. The organization is comprised of community leaders, neighborhood association presidents, and people passionate about protecting southwest Memphis from environmental harm. Memphis Community Against Pollution held a meeting at which the leadership committee was selected by the supporters present. Supporters inform the activities of Memphis Community Against Pollution in a variety of ways, including through leadership committee participation, social media, and at organization-wide meetings and events.

18.    Many supporters of Memphis Community Against Pollution live in neighborhoods through which the proposed Byhalia pipeline is being routed, and many supporters are also Memphis Light Gas & Water ("MLGW") ratepayers who obtain their drinking water from the Memphis Sand Aquifer.

19.    The Memphis Sand Aquifer is a unique and valuable natural resource. A portion of the aquifer is located under Memphis, and it provides Memphis and Shelby County, Tennessee, residents with clean, reliable drinking water. MLGW operates several drinking water wellfields

that supply drinking water to Memphis residents. One such wellfield, the Davis wellfield, is located in southwest Memphis and provides drinking water to many Memphis Community Against Pollution supporters.

20.     Memphis Community Against Pollution's mission is to pursue environmental justice for Black communities in southwest Memphis, including the historic African American neighborhood Boxtown; to protect the health and environment of southwest Memphis; and to prevent environmental racism.

21.     Southwest Memphis is already overburdened by industrial infrastructure. An oil refinery, steel mill, retired coal plant with unlined coal ash pits, and a natural gas plant are all located in southwest Memphis, which is over 97% Black. Residents of this area have a cancer risk of four times the national average, and they also suffer higher asthma rates than the rest of the greater Memphis area.

22.     To achieve its mission, Memphis Community Against Pollution and its supporters work to raise public awareness of the environmental burdens which are unjustly and disproportionately borne by Black communities. The organization works with government entities, elected officials, and community leaders to oppose the continued and disproportionate placement of industrial infrastructure in Black communities in southwest Memphis. Memphis Community Against Pollution also speaks to the media and participates in informal advocacy to raise awareness and further its goals.

23.     Memphis Community Against Pollution advocates on behalf of Black communities in southwest Memphis to oppose potential contamination threats to their source of clean drinking water from the Memphis Sand Aquifer, including the proposed Byhalia pipeline.

24.     Memphis Community Against Pollution further advocates on behalf of Black neighborhoods in southwest Memphis to oppose potential contamination threats to air, land, and waters in their community.

25.     Memphis Community Against Pollution was originally formed in October 2020 as Memphis Community Against the Pipeline to oppose the proposed Byhalia pipeline. Memphis Community Against Pollution opposes the construction and operation of a high-pressure crude oil pipeline through environmentally overburdened, majority-Black, southwest Memphis neighborhoods, including through a drinking water wellfield that serves these communities.

26.     Construction and operation of the proposed Byhalia pipeline will threaten the purity of the Memphis Sand Aquifer based on the pipeline's proposed route and its risk of leaking. A spill or leak from the pipeline, particularly an undetected one near a breach in the clay layer protecting the Memphis Sand Aquifer or through a wellfield in a wellhead management zone, increases the risk that the drinking water aquifer will become contaminated.

27.     Construction and operation of the proposed Byhalia pipeline also threatens the environment of southwest Memphis more generally. Pipeline construction will impact wetlands and streams in the southwest Memphis community that Memphis Community Against Pollution seeks to protect. A pipeline leak or spill would not only threaten the aquifer but could contaminate the land and surface waters of southwest Memphis.

28.     The Corps' authorization of the Byhalia pipeline under the 2017 version of Nationwide Permit 12 directly harms Memphis Community Against Pollution and its supporters by increasing the likelihood of contamination of their supply of safe, consistently available drinking water as well as surface waters in the southwest Memphis community. The Corps'

authorization also interferes with Memphis Community Against Pollution's central mission of advocating against further environmental burdens being placed in their community.

29.     The Corps' authorization of the Byhalia pipeline under Nationwide Permit 12 specifically harms Memphis Community Against Pollution and its supporters by depriving them of important information about the potential environmental impacts of the Byhalia pipeline and of the opportunity to participate in the Corps' decision-making process—information and opportunities that would be provided if the Byhalia pipeline went through the individual permitting process. Without adequate disclosures under NEPA, Memphis Community Against Pollution and its supporters are unable to fully assess the risks and implications of the Byhalia pipeline on the long-term health of affected southwest Memphis communities and the Memphis Sand Aquifer. Memphis Community Against Pollution believes that project-specific consideration of environmental effects under NEPA, the public interest analysis and requirement to identify the "least environmentally damaging practicable alternative," and other factors under the Clean Water Act, could lead the Corps to require additional mitigation or look at, and potentially choose, alternative pipeline routes that avoid southwest Memphis communities and better protect the aquifer and surface waters. By depriving Memphis Community Against Pollution of the opportunity to understand, comment upon, and engage in public outreach and education regarding the Byhalia pipeline, the Corps is impeding Memphis Community Against Pollution's ability to advocate for its communities including the preservation and protection of its clean drinking water source.

30.     Memphis Community Against Pollution wrote the Corps in April 2021 informing it of the unassessed environmental justice effects associated with the use of Nationwide Permit 12 to build the Byhalia pipeline and other projects. The Corps' refusal to acknowledge those effects

under NEPA and complete supplemental NEPA analysis further harms Memphis Community Against Pollution.

31.     Memphis Community Against Pollution also represents the interests of its individual supporters, including Justin J. Pearson, among others, in prosecuting this lawsuit.

32.     Mr. Pearson is a native Memphian and a Special Assistant to the Chief Executive Officer of Year Up, Inc. His family owns property in southwest Memphis which is located less than a mile away from the proposed Byhalia pipeline route. Mr. Pearson visits his family home in southwest Memphis often. While there, he drinks the tap water which is provided by MLGW.

33.     Mr. Pearson is a co-founder of Memphis Community Against Pollution, which was formed to oppose the proposed Byhalia pipeline's route through his community. Mr. Pearson is a current supporter of the organization, a member of the leadership committee, and he contributes financially to Memphis Community Against Pollution's activities.

34.     The consequences of the Corps' decision to authorize construction of the Byhalia pipeline under Nationwide Permit 12 harms individual supporters of Memphis Community Against Pollution's, including Mr. Pearson's, work to advocate for their communities. Mr. Pearson is concerned about the Byhalia pipeline's placement through MLGW's Davis wellfield, which supplies drinking water to his family home and his neighbors in southwest Memphis. Mr. Pearson is specifically concerned that the pipeline will leak and contaminate this wellfield, the Memphis Sand Aquifer, and the surrounding community.

35.     Mr. Pearson is also concerned about more environmental burdens being placed in his community without public input and the increased risk of contamination of his community and their drinking water source. Mr. Pearson has several family members who lived for decades in southwest Memphis and died of cancer while still relatively young. Siting additional, significant

industrial infrastructure that is an actual and potential source of environmental degradation in southwest Memphis communities harms the interests of Mr. Pearson and Memphis Community Against Pollution.

36.     Mr. Pearson is also concerned that the pipeline may leak in his community and pollute nearby McKellar Lake and Cypress Creek. Mr. Pearson remembers a sewage spill which occurred in Cypress Creek in 2016 that caused millions of dollars in damage, some of which still remains. He is concerned that something similar could happen due to an oil spill from the proposed Byhalia pipeline. Mr. Pearson is also concerned that construction activities to bury the pipeline along these water bodies, as well as along T.O. Fuller State Park, will damage these areas, cause traffic and noise impacts, and deprive his community of access to green space.

37.     Because advocating against unjust environmental burdens on southwest Memphis communities is important to Memphis Community Against Pollution's mission, its supporters' interests, including Mr. Pearson's, can be represented by the organization in this suit.

38.     The harm and injury suffered by Memphis Community Against Pollution can and should be redressed through the entry of a judgment declaring Nationwide Permit 12 unlawful, vacating any and all approvals for the Byhalia pipeline under Nationwide Permit 12, and enjoining its use for the Byhalia pipeline.

### Sierra Club

39.     Plaintiff Sierra Club is a corporation organized and existing under the laws of the State of California, and is a national non-profit organization advocating for strong environmental laws to support the preservation and longevity of healthy ecosystems. Sierra Club was founded in 1892, is headquartered in Oakland, California, and has approximately 820,193 members. The Tennessee chapter of the Sierra Club consists of approximately 9,585 members.

40.     Sierra Club brings this action on its own institutional behalf and on behalf of its supporters and members in West Tennessee and North Mississippi. Many Sierra Club members in this region obtain their drinking water from the Memphis Sand Aquifer. Sierra Club members also recreate on surface waters crossed by the Byhalia pipeline or located downstream of tributaries and wetlands crossed by the pipeline and plan to continue doing so, though construction and operation of the Byhalia pipeline could impact those plans.

41.     Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

42.     Sierra Club has long been concerned about climate change and how the continued burning of coal, oil, and natural gas furthers climate change. To ensure climate change impacts are properly accounted for, Sierra Club encourages federal agencies to fully account for climate change impacts when building new fossil fuel infrastructure. The Corps' failure to do so in connection with the Byhalia pipeline harms Sierra Club. Sierra Club opposes the use of Nationwide Permit 12 to construct new oil and gas pipelines. If new oil and gas pipelines are going to be constructed, they need to be subject to project-specific environmental analysis and public comment.

43.     Environmental justice is also a priority for Sierra Club. Part of Sierra Club's mission is to discuss and explore the linkages between environmental quality and social justice, and to promote dialogue, increased understanding, and appropriate action. Sierra Club advocates to ensure environmental justice is considered in federal agency decision-making and that impacted minority and low-income communities have a voice in those decisions.

44.     Sierra Club also seeks to preserve and protect unique and precious natural resources such as the Memphis Sand Aquifer. The Memphis Sand Aquifer is vulnerable to contamination from sources in West Tennessee and North Mississippi, including in areas along the proposed Byhalia pipeline route. Installing a high-pressure crude oil pipeline through these areas exacerbates the contamination risk to the aquifer.

45.     To achieve its mission, Sierra Club and its members work to raise public awareness of threats to natural resources, including current sources of contamination and threats or risks of future sources of contamination. Additionally, the organization works with government, elected officials, community groups, and public and private entities to put in place or enhance protection of natural resources.

46.     Sierra Club frequently advocates on behalf of the environment and against threats to it. Sierra Club also speaks to the media and participates in informal advocacy as well as federal, state, and local public agency proceedings regarding these impacts. Sierra Club also engages with government and elected officials on these topics.

47.     As part of its advocacy efforts, Sierra Club regularly participates in the public process afforded to projects affecting the environment under federal and state laws. For instance, Sierra Club submitted comments during the comment period for the 2017 Nationwide Permit 12 rulemaking.

48.     Construction and operation of the proposed Byhalia pipeline will threaten the long-term health of the Memphis Sand Aquifer which Sierra Club members rely on for drinking water. The proposed Byhalia pipeline is routed over several known and suspected breaches in the clay layer protecting the Memphis Sand Aquifer, and over several miles of the aquifer's recharge zone in North Mississippi which has no protective clay layer. Given the high risk that the pipeline will

leak, and that this leak will go undetected, the pipeline's construction and operation significantly increase the risk that the Memphis Sand Aquifer will become contaminated, thus affecting the clean water supply of several Sierra Club members and supporters.

49. Construction and operation of the proposed Byhalia pipeline will also threaten the long-term health of surface waters used and enjoyed by Sierra Club members. The proposed pipeline route traverses tributaries or wetlands that either feed into or are hydrologically connected to McKellar Lake and the Coldwater River, among other surface waters. Sierra Club members boat, fish, camp, and otherwise recreate in and around these and other waters affected by the pipeline; the pipeline's proposed route increases the risk that a spill, including an undetected one, would damage these surface waters and the surrounding lands.

50. One or more Sierra Club members own property on or near the proposed pipeline route. The project threatens these individuals' use and enjoyment, and the economic value, of their property.

51. The Corps' authorization of the Byhalia pipeline under Nationwide Permit 12 directly harms Sierra Club and its members by increasing the likelihood of contamination of their drinking water supply and surface waters where they recreate. The Corps' authorization also interferes with Sierra Club's central mission of protecting and preserving natural resources and opposing projects which would exacerbate climate change.

52. The Corps' authorization of the Byhalia pipeline under Nationwide Permit 12 specifically harms Sierra Club and its supporters by depriving them of vital information about the potential environmental impacts of the Byhalia pipeline and of the opportunity to participate in the Corps' decision-making process—information and opportunities that would be provided if the Byhalia pipeline went through the individual permitting process. Without adequate NEPA

analysis, Sierra Club and its members are unable to adequately assess the risks and implications of the Byhalia pipeline on the long-term health of the Memphis Sand Aquifer and affected surface waters. Sierra Club believes that project-specific consideration of environmental effects under NEPA, the public interest analysis and requirement to identify the "least environmentally damaging practicable alternative," and other factors under the Clean Water Act, could lead the Corps to require additional mitigation or potentially study and choose a different pipeline route that better protects affected ground and surface waters. By depriving Sierra Club of the opportunity to understand, comment upon, and engage in public outreach and education regarding the Byhalia pipeline, the Corps is impeding Sierra Club's ability to advocate for the preservation and protection of the Memphis Sand Aquifer and affected surface waters.

53.     Sierra Club was also harmed by the Corps' failure to take a "hard look" at environmental effects and prepare an Environmental Impact Statement when the Corps reissued Nationwide Permit 12 in 2017. It is a priority of Sierra Club to have federal agencies adequately disclose the environmental effects of their actions and Sierra Club uses that information to fulfill its organizational priorities. Disclosure of environmental effects in compliance with NEPA could have led the Corps to determine that construction of a new oil and gas pipeline necessitates an individual permit, rather than a nationwide permit. This would require pipeline-specific environmental analysis and public comment. Without those processes, Sierra Club has no timely mechanism to know when the Corps is approving oil and gas pipelines, because Corps' districts often do not make Nationwide Permit 12 preconstruction notifications publicly available—and some Nationwide Permit 12 projects do not even require preconstruction notifications. Sierra Club's inability to learn about these projects harms its interests in making sure the environmental effects of these projects are properly accounted for. Sierra Club's interests have already been

harmed by other pipeline projects verified under the 2017 version of Nationwide Permit 12, including but not limited to the Keystone XL Pipeline, Atlantic Coast Pipeline, Mountain Valley Pipeline, and Permian Highway Pipeline.

54.     Sierra Club was harmed by the Corps' failure to take a "hard look" at environmental justice effects in its NEPA analysis when issuing Nationwide Permit 12 in 2017. Sierra Club wrote the Corps in April 2021 informing the agency of the significant unassessed environmental justice effects associated with Nationwide Permit 12 and its use to construct the Byhalia pipeline and other projects. The Corps' continued use of Nationwide Permit 12 while failing to complete supplemental NEPA analysis harms Sierra Club and its members.

55.     The public interest analysis undertaken by the Corps during its 2017 reissuance of Nationwide Permit 12 was also inadequate. The Corps was unable to engage in an effective public interest analysis at the time because it did not know the details of the myriad, unique, and wide-ranging projects which were to be authorized under Nationwide Permit 12, including the Byhalia pipeline, and so it could not provide a meaningful analysis of the probable impacts of these projects.

56.     The consequences of the Corps' decision to authorize construction of the Byhalia pipeline under Nationwide Permit 12 also harms individual members of Sierra Club. Members of Sierra Club, including staff, live near and recreate on surface waters crossed by the pipeline or tributaries or wetlands that feed into those surface waters, and multiple Sierra Club members source their drinking water from the Memphis Sand Aquifer.

57.     Sierra Club represents the interests of its individual members, including Scott Banbury, among others, in prosecuting this lawsuit. Mr. Banbury is a member of the Tennessee

Chapter of Sierra Club and is employed by the organization as a Conservation Program Coordinator for Sierra Club's operations in Tennessee.

58.     The Corps' decision to authorize construction of the Byhalia pipeline under Nationwide Permit 12 harms individual members of Sierra Club, including Mr. Banbury, who advocate for natural resource protection in Tennessee and elsewhere. Mr. Banbury owns a home in Memphis and lived in the area for twenty-nine years. He travels there frequently to see his family.

59.     Mr. Banbury has spent several years participating in cleanups on McKellar Lake in coordination with other local environmental groups. The groups collect trash and recyclable material from the shoreline and dispose of it accordingly. Mr. Banbury also co-hosts an annual cleanup of the lake that occurs every February. Mr. Banbury is concerned that an oil spill or leak from the Byhalia pipeline, which is routed to cross wetlands that are hydrologically connected to tributaries to McKellar Lake, will affect this surface water by making it even more polluted. A spill or leak would undermine the work that Mr. Banbury has done to clean McKellar Lake and to educate the public about its importance, and would make it less likely that he invites community groups to participate in cleanup activities and events until he could ensure that they could be done safely.

60.     Mr. Banbury also purchases water for his home in Memphis from MLGW. Mr. Banbury is concerned that a leak from the Byhalia pipeline would contaminate the Memphis Sand Aquifer that provides drinking water for Memphis, especially if that leak were undetected or occurred around the wellhead protection area of the Davis wellfield. Mr. Banbury is concerned that a leak would negatively impact the quality of his family's drinking water and raise his water

bill due to increased pass-through costs from MLGW to purify water or to abandon and replace contaminated drinking water wells.

61.     Mr. Banbury has reviewed information on the potential for an oil spill from a pipeline and what he has found only confirms his concerns. For instance, Mr. Banbury has learned that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") has recorded more than 4,000 oil and fuel spills since 2010, but only about 7% of those were caught by leak detection systems. Mr. Banbury has also reviewed PHMSA data showing that thousands of barrels of oil are spilled each year resulting in millions of dollars of damages and sometimes injuries or even fatalities. Mr. Banbury is also aware that Plains All American Pipeline, one of the joint venture partners in the Byhalia pipeline project, has a known history of significant oil spills. For example, Mr. Banbury is aware that in 2015, a pipeline owned by Plains All American Pipeline in California spilled 2,934 barrels of oil which resulted in over $450 million in cleanup costs.

62.     Sierra Club members, including Mr. Banbury, are concerned about the effects of pipeline construction on surface waters and wetlands, and the increased likelihood of contamination of affected surface waters and the Memphis Sand Aquifer that might result from a spill or leak. The Byhalia pipeline is routed over vulnerable surface waters and through areas with known and suspected breaches of the clay layer protecting the Memphis Sand Aquifer, including several miles of its recharge zone. Because preservation of these water sources is an important part of Sierra Club's mission, its members' interests can be represented by the organization in this suit.

63.     The harm and injury suffered by Sierra Club and its supporters can and should be redressed through the entry of a judgment declaring Nationwide Permit 12 unlawful, vacating any and all approvals for the Byhalia pipeline under Nationwide Permit 12, and enjoining its use for the Byhalia pipeline.

**Protect Our Aquifer**

64.     Plaintiff Protect Our Aquifer is a non-profit organization dedicated to preserving and protecting the Memphis Sand Aquifer for the benefit of present and future generations. It is headquartered in Memphis, Tennessee.

65.     Protect Our Aquifer brings this action on its own institutional behalf and on behalf of its supporters in West Tennessee. Protect Our Aquifer's supporters include twelve board members and two paid (part-time) staff, over 1,000 financial donors, a 967-person email alert list, and a Facebook Group page with 3,500 members who can only join with permission of the administrator. Supporters inform the activities of Protect Our Aquifer in a variety of ways, including through board participation and Facebook Group member comments.

66.     Many supporters of Protect Our Aquifer are MLGW ratepayers who obtain their drinking water from the Memphis Sand Aquifer.

67.     The Memphis Sand Aquifer is an important and limited natural resource that underlies much of West Tennessee and North Mississippi. The aquifer supplies Memphis and Shelby County with clean, reliable drinking water. According to the United States Geological Survey, the Memphis, Tennessee area is one of the largest metropolitan areas in the United States that relies exclusively on groundwater for municipal water supply.

68.     The Memphis Sand Aquifer is vulnerable to contamination from a variety of sources in the West Tennessee and North Mississippi area, including in the vicinity of the proposed Byhalia pipeline route. Routing a high-pressure oil pipeline in this area exacerbates the contamination risk.

69.     To achieve its mission, Protect Our Aquifer and its supporters work to raise public awareness of threats to the Memphis Sand Aquifer. Additionally, the organization works with

government, elected officials, local power distributors, and members of the community to develop and implement strategies to manage, monitor, and protect this drinking water source.

70.     Protect Our Aquifer frequently advocates on behalf of the aquifer to government decision-makers regarding the impact of proposed industry and infrastructure on the water quantity and water quality of the aquifer. Protect Our Aquifer also speaks to the media and participates in informal advocacy as well as the proceedings of state and local public agencies regarding these impacts.

71.     Protect Our Aquifer was founded in 2016 in response to the Tennessee Valley Authority's ("TVA") plan to drill wells into the Memphis Sand Aquifer and withdraw large quantities of water to operate its Allen Gas Plant. Since that time, Protect Our Aquifer has engaged in other advocacy efforts regarding proposed actions of TVA and others that have the potential to deplete or contaminate the Memphis Sand Aquifer.

72.     Protect Our Aquifer frequently uses information from environmental review documents prepared on behalf of federal entities to further its mission. For example, during the Allen Gas Plant controversy, Protect Our Aquifer used and relied on documents developed by the United States Geological Survey on behalf of TVA during the federal utility's environmental review process, and it consulted with outside experts to review the data from those documents, as well as from environmental documents that TVA submitted to the Tennessee Department of Environment and Conservation, in order to better understand the threat the project posed to the aquifer and to provide more information and analysis to the media, the public, and to public agencies that could influence TVA's actions.

73.     Protect Our Aquifer also has a history of commenting on and using information from publicly disclosed environmental review documents to protect the Memphis Sand Aquifer.

For example, in November 2019, Protect Our Aquifer commented to TVA on the draft EIS for the Allen Fossil Plant Ash Impoundment Closure, with a particular focus on concerns regarding the potential impacts of coal ash contamination on the Memphis Sand Aquifer. Like the Byhalia pipeline, the coal ash pits at the Allen Fossil Plant are situated above areas of the Memphis Sand Aquifer known to be vulnerable to contamination due to confirmed and suspected breaches in the clay layer that protects the aquifer.

74. Construction and operation of the proposed Byhalia pipeline will threaten the long-term health of the Memphis Sand Aquifer based on its route above known and suspected breaches in the clay layer protecting the aquifer and given the high risk that the pipeline will leak and that leak will go undetected. A spill or leak from the pipeline, particularly an undetected one, dramatically increases the risk that the aquifer will become contaminated.

75. The Corps' authorization of the Byhalia pipeline under Nationwide Permit 12 in contravention of the environmental and public interest analyses required by the Clean Water Act and NEPA for categories of activities which will have more-than-minimal or significant effects, respectively, on the environment, directly harms Protect Our Aquifer and its supporters by increasing the likelihood of contamination of the supply of safe drinking water available to Protect Our Aquifer supporters and interferes with Protect Our Aquifer's central mission of protecting the quantity and quality of water in the Memphis Sand Aquifer.

76. The Corps' authorization of the Byhalia pipeline under Nationwide Permit 12 specifically harms Protect Our Aquifer and its supporters by depriving them of vital information about the potential environmental impacts of the Byhalia pipeline and of the opportunity to participate in the Corps' decision-making process—information and opportunities that would be provided if the Byhalia pipeline went through the individual permitting process. Without adequate

analysis and public disclosures under NEPA, Protect Our Aquifer and its supporters are unable to adequately assess the risks and implications of the Byhalia pipeline on the long-term health of the Memphis Sand Aquifer. Protect Our Aquifer believes that project-specific consideration of environmental effects under NEPA, the public interest analysis and requirement to identify the "least environmentally damaging practicable alternative," and other factors under the Clean Water Act, could lead the Corps to require additional mitigation or study and potentially choose a pipeline route that better protects the aquifer. By depriving Protect Our Aquifer of the opportunity to understand, comment upon, and engage in public outreach and education regarding the Byhalia pipeline, the Corps is impeding Protect Our Aquifer's ability to advocate for the preservation and protection of the Memphis Sand Aquifer.

77.     In April 2021, Protect Our Aquifer wrote the Corps informing the agency of the unassessed environmental justice effects of using Nationwide Permit 12 to construct the Byhalia pipeline and other projects. Protect Our Aquifer believes all communities in Memphis should have equal access to clean drinking water. Protect Our Aquifer is concerned about the environmental burdens that have already been placed on communities affected by the Byhalia pipeline. The aquifer in this area is already at risk from contamination from other sources such as TVA's Allen plant. Protect Our Aquifer believes that the proper consideration of environmental justice effects under NEPA could lead the Corps and pipeline developers to choose a different route, or add additional mitigation to the project. Protect Our Aquifer is harmed by the Corps' failure to consider environmental justice effects under NEPA in connection with its continued use of Nationwide Permit 12 including construction of the Byhalia pipeline.

78.     Protect Our Aquifer also represents the interests of its individual supporters, including Ward Archer, among others, in prosecuting this lawsuit. Mr. Archer is the former CEO

of the advertising firm Archer Malmo and is president of the board of Memphis magazine. Mr. Archer serves on the Center for Applied Earth Science and Engineering Research ("CAESER") Advisory Board at the University of Memphis, and previously served as a member of the groundwater working group for former Governor Haslam's Tennessee $H_2O$ task force.

79.     Mr. Archer founded Protect Our Aquifer, is a current supporter of the organization, is a member of the Board, and serves as President. Mr. Archer participates in voting regarding the leadership of Protect Our Aquifer and contributes financially to Protect Our Aquifer's activities.

80.     Before Mr. Archer founded Protect Our Aquifer, there was no voice in the Memphis community that specifically advocated for the protection of the Memphis Sand Aquifer. The Memphis Sand Aquifer is Memphis and Shelby County's drinking water source and a resource about which Mr. Archer cares deeply. Mr. Archer believes that without the dedication of the members of its board and its community of supporters, Protect Our Aquifer could not exist.

81.     Mr. Archer obtains his residential water from MLGW and wants to continue to have the opportunity to buy clean drinking water sourced from the Memphis Sand Aquifer.

82.     The Corps' authorization of the proposed Byhalia pipeline through Nationwide Permit 12 harms individual supporters of Protect Our Aquifer, including Mr. Archer, who work to preserve and protect the Memphis Sand Aquifer for the benefit of present and future generations. Mr. Archer is concerned about the increased contamination risk to the aquifer, and the resulting impacts on Memphis' and Shelby County's drinking water source. The proposed Byhalia pipeline is routed over several known and suspected breaches to the clay layer protecting the aquifer, including its recharge zone, and Protect Our Aquifer's supporters like Mr. Archer will face an increased risk of contamination of the Memphis Sand Aquifer and their drinking water source as

a result. Because preservation of the aquifer is important to Protect Our Aquifer's mission, its supporters' interests can be represented by the organization in this suit.

83.     The harm and injury suffered by Protect Our Aquifer and its supporters can and should be redressed through the entry of a judgment declaring Nationwide Permit 12 unlawful, vacating any and all approvals for the Byhalia pipeline under Nationwide Permit 12, and enjoining its use for the Byhalia pipeline.

### United States Army Corps of Engineers

84.     Defendant United States Army Corps of Engineers is a federal agency located within the Department of Defense and charged with administering permits under Section 404 of the Clean Water Act for the discharge of dredged or fill material into waters of the United States. The Corps is headquartered in Washington, D.C. The Headquarters office issued the nationwide permit at issue in this litigation. Use of Nationwide Permit 12 for the Byhalia pipeline was verified by the Memphis District of the Corps as well as the Vicksburg District.

85.     Defendant Lieutenant General Scott Spellmon is Chief of Engineers and Commanding General of the United States Army Corps of Engineers. Lieutenant General Spellmon is headquartered in Washington, D.C., and is designated to act for the Secretary of the Army. Lieutenant General Spellmon is sued in his official capacity only.

### Legal Background

### The Clean Water Act

86.     The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

87.     Congress pursued those goals, in part, through a permitting scheme. Congress prohibited the discharge of "dredged or fill material into the navigable waters" without a permit,

33 U.S.C. §§ 1311, 1344, but gave the "Secretary of the Army, acting through the Chief of Engineers," *id.* § 1344(d), authority to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites," *id.* § 1344(a). These permits are generally known as § 404 permits.

88.    Congress amended the Clean Water Act in 1977 to give the Secretary of the Army additional authority to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." Pub. L. No. 95-217, § 67 (Dec. 27, 1977) (codified at 33 U.S.C. § 1344(e)(1)).

89.    As a result, today the Corps issues two types of § 404 permits: individual permits and general permits. 33 C.F.R. § 320.1(c). Individual permits are "issued following a case-by-case evaluation of a specific project." *Id.* § 323.2(g). Individual permits may not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," 40 C.F.R. § 230.10(a), but this requirement "is not directly applicable to General permits," *id.* § 230.7(b)(1). General permits are issued on a nationwide or regional basis for "activities [that] are substantially similar in nature and cause only minimal individual and cumulative environmental impacts." 33 C.F.R. § 323.2(h)(1); *see* 33 U.S.C. § 1344(e)(1). Nationwide Permit 12 is a general permit. The Corps must make a minimal-effects finding "before any General permit is issued." 40 C.F.R. § 230.7(b). General permits must be reissued at least every five years or they expire. 33 U.S.C. § 1344(e)(2).

25

90.     The Corps is required to consider the public interest whenever it issues a § 404 permit. For both general and individual permits, the "decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case." *Id.* "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.* "All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, . . . floodplain values, land use, . . . recreation, water supply and conservation, water quality, energy needs, safety, . . . considerations of property ownership and, in general, the needs and welfare of the people." *Id.*; *see also id.* § 320.1(a)(1) (Corps permitting decisions are based on "consideration of the full public interest by balancing the favorable impacts against the detrimental impacts.").

91.     The requirement to consider the public interest when issuing § 404 permits has been included in the Corps' regulations since at least 1975. *See* 40 Fed. Reg. 31,320, 31,327 (July 25, 1975) ("No permit will be granted unless its issuance is found to be in the public interest.").

92.     In addition to its required public interest review, the Corps may not issue a general permit or individual permit that does not comply with the § 404(b)(1) guidelines issued jointly by the Corps and the U.S. Environmental Protection Agency ("EPA"). 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(b). Factors to consider under the § 404(b)(1) guidelines include, among other things, effects on "surface water or ground water which is directed to the intake of a municipal or

private water supply system," 40 C.F.R. § 230.50(a), and "aesthetics," including aesthetic effects associated with "inducing inappropriate development" as a result of the discharge, *id.* § 230.53.

93.     Nationwide permits are a type of general permit that apply nationwide. 33 C.F.R. § 330.1(b).

94.     Once a nationwide permit is issued, specific projects that meet the terms and conditions of that nationwide permit may proceed without obtaining an individual § 404 permit. "In most cases, permittees may proceed with activities authorized by [nationwide permits] without notifying [the Corps]" at all. *Id.* § 330.1(e)(1).

95.     However, activities that the Corps has determined risk more-than-minimal adverse effects must submit a preconstruction notification to the Corps prior to using a nationwide permit. When the Corps issues the nationwide permit, it lists those actions authorized under the permit that have the potential to cause more-than-minimal impacts, necessitating Corps review. If one of these scenarios applies, the permittee must submit a preconstruction notification to seek verification from the Corps that their project qualifies for the specific nationwide permit. *See id.* §§ 330.1(e)(1), 330.6(a). For those projects requiring a preconstruction notification, the Corps "will review the notification and may add activity-specific conditions to ensure . . . that the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal." *Id.* § 330.1(e)(2). Depending on its findings, the Corps either verifies the availability of the nationwide permit without adding project-specific conditions, denies verification, or "add[s] conditions on a case-by-case basis to clarify compliance with the terms and conditions of [the nationwide permit] or to ensure that the activity will have only minimal individual and cumulative adverse effects on the environment, and will not be contrary to the public interest." *See id.* § 330.6(a). In certain situations, a prospective permittee may presume that his or her project qualifies

for the nationwide permit if the Corps does not respond to a preconstruction notification within forty-five days. *Id.* § 330.1(e)(1).

96.     Once verified, the permittee may use the nationwide permit to discharge dredged or fill material. If verification is denied, the permit applicant can pursue an individual § 404 permit or change its project to again attempt to qualify for the nationwide permit.

**The National Environmental Policy Act**

97.     The Corps' permitting decisions—for both individual and general permits—require compliance with NEPA.

98.     NEPA was enacted in 1969 "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

99.     NEPA has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal citation and quotation marks omitted).

100.     NEPA's objectives are "realized through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences,' . . . and [] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted).

101.     These action-forcing procedures include the requirement to prepare a "detailed statement" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This "detailed statement"—generally referred to as an

28

environmental impact statement ("EIS")—must disclose "the environmental impact of the proposed action" and consider "alternatives to the proposed action," among other things. *Id.*

102.    If the need for an EIS is unclear—i.e., if it is unclear whether the major federal action will significantly affect the quality of the human environment—the Corps may first prepare an Environmental Assessment ("EA"). 33 C.F.R. § 230.10. The purpose of an EA is to provide "sufficient information . . . on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS." *Id.*; *see* 40 C.F.R. § 1508.9 (1978).

103.    Both EISs and EAs consider effects on the "human environment." The "human environment" is broadly defined to include "the natural and physical environment and the relationship of people with that environment" including "economic or social effects." 40 C.F.R. § 1508.14 (1978); *see also id.* § 1508.1(m) (2020) (defining "human environment" as "comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment").

104.    When Congress enacted NEPA, it simultaneously created the Council on Environmental Quality ("CEQ"). 42 U.S.C. § 4342. CEQ has promulgated regulations implementing NEPA that apply to the Corps. *See* 33 C.F.R. § 230.1 (noting applicability of CEQ's NEPA regulations to the Corps). CEQ recently revised its NEPA-implementing regulations, *see* Final Rule, 85 Fed. Reg. 43,304 (July 16, 2020), but the 2017 version of Nationwide Permit 12 used to verify the Byhalia pipeline was promulgated using the 1978 version of CEQ's regulations.

105.    The 1978 CEQ regulations defined environmental effects in terms of direct effects, indirect effects, and cumulative effects. "Direct effects . . . are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (1978). "Indirect effects . . . are caused by the

action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* § 1508.8(b) (1978). Cumulative effects "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7 (1978).

106.    Environmental justice effects are encompassed in NEPA's requirement to take a "hard look" at environmental effects.

107.    To understand the consequences of an action, the direct, indirect, and cumulative effects were to be compared to the "affected environment," sometimes called the "environmental baseline." *See id.* § 1502.15 (1978). "Verbose descriptions of the affected environment are themselves no measure of the adequacy of" an environmental analysis. *Id.*

108.    Under CEQ's NEPA regulations in place at the time the 2017 version of Nationwide Permit 12 was promulgated, agencies had to consider the "context" and "intensity" of an action when determining whether an EIS was required. *Id.* § 1508.27. To consider context, "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of [effects]." *Id.* § 1508.27(b). The regulation provides ten factors that "should be considered in evaluating intensity." *Id.*

109.    If an EA revealed that the action would not have significant impacts, then the action could proceed with a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.27; 33 C.F.R. § 230.11. But "[i]f *any* 'significant' environmental impacts might result from the proposed agency

action then an EIS must be prepared *before* the action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

110.    The obligation to take a "hard look" at the environmental effects of a planned action may persist "even after a proposal has received initial approval." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). Specifically, an agency must supplement a previous NEPA analysis when agency action remains to occur and "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1978); *see also* 40 C.F.R. § 1502.9(d) (2020); 33. C.F.R. § 230.13(b).

111.    The Corps is entitled to no deference in its interpretation of NEPA. *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019).

### Administrative Procedure Act

112.    The APA requires a reviewing court to set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2). If the agency has failed to act, the court must "compel" the action if it has been "unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Questions of law are reviewed de novo, while findings of fact are reviewed under the arbitrary and capricious standard. Under the arbitrary and capricious standard, the reviewing court must look at whether the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reviewing court may not supply a reasoned basis for the agency's action that the agency itself has not given. *Id.*

**Factual Background**

**Nationwide Permit 12**

113.     The version of Nationwide Permit 12 applicable to the Byhalia pipeline authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities into waters of the United States, provided the activity does not result in the loss of greater than ½-acre of waters of the United States for each single and complete project." 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017). The permit was issued in 2017. *Id.* "Utility line" is broadly defined to include "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance[,]" which includes oil pipelines. *Id.*

114.     For most nationwide permits, "single and complete project" means "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers." *Id.* at 2007. But for linear projects—projects which "get[] people, goods, or services from a point of origin to a terminal point"—like pipelines approved under Nationwide Permit 12, a "single and complete project" means "all crossings of a single water of the United States (*i.e.*, a single waterbody) *at a specific location*." *Id.* (emphasis added). "For linear projects crossing a single or multiple waterbodies [sic] several times at separate and distant locations, each crossing is considered a single and complete project." *Id.* In other words, pipeline developers may rely on Nationwide Permit 12 at each location where the project crosses a water of the United States—even for multiple crossings of the same jurisdictional stream or wetland—so long as: 1) the Corps considers each individual crossing to be "separate and distant" from the next; and 2) each individual crossing does not cause the loss of more than ½-acre of waters of the United States. *Id.* at 2006.

115.    The Corps does not define "separate and distant." The Corps has indicated its belief that "separate and distant" crossings are "usually at separate waterbodies" and are "often in different watersheds," but has provided no evidence demonstrating that is true. Nationwide Permit 12 Decision Document at 11 (2017).

116.    Nationwide Permit 12 includes no limitation on the number of individual crossings that can be authorized for a single pipeline project. Nor does it limit the total number of acres of waters that can be impacted by a single pipeline project. As a result, the Corps has verified use of Nationwide Permit 12 for pipelines with over *two thousand* individual waterbody crossings, with each individual crossing causing the loss of less than ½-acre of waters of the United States.

117.    When the Corps reissued Nationwide Permit 12 in 2017, it predicted that the permit would be used 14,000 times per year—more than any other individual nationwide permit save one. Nationwide Permit 12 Decision Document at 70 (2017). The Corps predicted that Nationwide Permit 4, which authorizes installation of "pound nets, crab traps, crab dredging, eel pots, lobster traps, duck blinds, and clam and oyster digging, fish aggregating devices, and small fish attraction devices" would be used most frequently but would only collectively affect 203 acres of jurisdictional waters annually. Nationwide Permit 4 Decision Document at 45 (2017). That is in contrast to Nationwide Permit 12, which was predicted to impact 1,750 acres of waters of the United States annually. Nationwide Permit 12 Decision Document at 70 (2017). Over the five-year life of the permit, Nationwide Permit 12 was predicted to be used 69,700 times, resulting in impacts to 8,900 acres of waters of the United States. *Id.* The Corps estimates that "9 percent of the [Nationwide Permit] 12 verifications will require compensatory mitigation." *Id.*

118.    Other nationwide permits are used much less frequently with fewer impacts to jurisdictional waters. For example, Nationwide Permit 40, which applies to "agricultural

activities," was predicted to be used "70 times per year on a national basis, resulting in impacts to approximately 12 acres of waters of the United States." Nationwide Permit 40 Decision Document at 48 (2017). Nationwide Permit 7, which applies to "outfall structures and associated intake structures," was predicted to be used "approximately 310 times per year on a national basis, resulting in impacts to approximately 20 acres of waters of the United States." Nationwide Permit 7 Decision Document at 47 (2017). Nationwide Permit 13, which applies to bank stabilization activities, was predicted to be used approximately 3,200 times per year on a national basis, resulting in impacts to approximately 80 acres of waters of the United States. Nationwide Permit 13 Decision Document at 76 (2017). Nationwide Permit 9, which applies to structures in fleeting and anchorage areas, was predicted to be used approximately 114 times per year on a national basis, resulting in impacts to approximately four acres of waters of the United States. Nationwide Permit 9 Decision Document at 33 (2017).

119.    In 2017, the Corps predicted that Nationwide Permit 12 would be used more frequently than forty-six of the fifty-one other nationwide permits *combined*.

120.    Qualifying for any nationwide permit, including Nationwide Permit 12, requires compliance with various General Conditions issued by the Corps. 82 Fed. Reg. at 1998. For example, General Condition 7 prohibits the use of a nationwide permit "in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization." *Id.* at 1999.

121.    The final rule reissuing Nationwide Permit 12 provides that, once a preconstruction notification is submitted, "the [Corps] will determine whether the activity authorized by the [nationwide permit] will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." *Id.* at 2004.

### The Corps' 2017 Nationwide Permit 12 NEPA Analysis

122.    On June 1, 2016, the Corps published a proposal to reauthorize all then-existing nationwide permits, including Nationwide Permit 12. 81 Fed. Reg. 35,186, 35,188 (June 1, 2016). The Corps invited public comment for a period of sixty days. *Id.* On August 1, 2016, Sierra Club and other groups submitted comments to the Corps that focused on Nationwide Permit 12 and outlined violations of the Clean Water Act, NEPA, and the Endangered Species Act.

123.    EPA also submitted comments. Those comments conveyed that the agency had "become increasingly concerned with the impacts resulting from multiple [nationwide permit] verifications for individual linear utility line or transportation projects. This practice raises the likelihood that projects will result in greater than minimal cumulative effects, and should be reviewed through the individual permit process." EPA Comments on Draft Proposed Reissuance and Issuance of Nationwide Permits at 3. "[A]lternatively," EPA "recommend[ed] that the Corps establish a cumulative acreage threshold for projects" using Nationwide Permits 12 and 14. *Id.*

124.    On January 6, 2017, the Corps published a final rule reissuing the fifty existing nationwide permits and issuing two new nationwide permits. 82 Fed. Reg. at 1860. Nationwide Permit 12 was reissued without the changes requested by EPA. *Id.* The Corps simultaneously issued a "Decision Document" for each nationwide permit including Nationwide Permit 12. The Decision Document "includes an environmental assessment with a mitigated finding of no significant impact." Nationwide Permit 12 Decision Document at 20 (2017). The Decision Document "marks the completion of the NEPA process" for all activities subsequently permitted under Nationwide Permit 12. 82 Fed. Reg. at 1867. The Corps takes the position that it "does not need to prepare a NEPA document" when verifying the applicability of Nationwide Permit 12 to a particular project "because the requirements for NEPA were fulfilled when the Corps

Headquarters issued the national decision document for the [nationwide permit]" in 2017. *Id.* at 1891.

125.    To evaluate the 2017 version of Nationwide Permit 12's effects under NEPA, the Corps used an environmental baseline that was "national in scope." Nationwide Permit 12 Decision Document at 28 (2017). The baseline "consists of terrestrial and aquatic ecosystems in the United States, as they have been directly and indirectly affected by past and present federal, non-federal, and private activities. The past and present activities include activities authorized by the various [nationwide permits] issued from 1977 to 2012 . . . as well as other federal, tribal, state, and private activities." *Id.* The baseline references activities dating to the 1600s. *Id.* at 49 (noting activities from the "17th to 19th centuries"). The baseline largely consists of "national information on the quantity and quality of wetlands, streams, and other aquatic resources," *id.* at 45, but the Corps acknowledged that there is "little national-level information on the ecological condition of the Nation's wetlands, streams, and other aquatic resources, or the amounts of functions they provide," *id.* at 50.

126.    When it came to assessing impacts, the Corps forecast that Nationwide Permit 12 would be used to authorize up to 69,700 activities over a five-year period and adversely impact 8,900 acres of jurisdictional waters. *Id.* at 70. However, the Corps did not know what those specific activities would be or where they would take place. *Id.* As a result, the Corps was unable to "describe the environmental conditions for specific sites where the [nationwide permit] may be used to authorize eligible activities" but acknowledged that this would be a "wide variety of environmental settings." *Id.* at 28, 42. For the same reasons, the Corps found that it was "difficult to predict all of the indirect impacts that may be associated with each activity authorized by" Nationwide Permit 12. *Id.* at 42.

127.    The Corps determined that "oil spills and gas pipeline leaks [were] reasonably foreseeable future actions" associated with Nationwide Permit 12. *Id.* at 23. More specifically, the Corps disclosed that relevant effects included those "caused by reasonably foreseeable future actions that may take place after the permitted activity is completed" including "direct and indirect environmental effects caused by the operation and maintenance" of the utility line. *Id.* at 47. The Corps further disclosed that "[d]uring the operation of utility lines, substances carried by those utility lines may leak into surrounding areas." *Id.* This could "adversely affect both surface water and groundwater supplies." *Id.* at 60.

128.    But the Corps limited its analysis of oil spills and leaks by pointing to General Condition 14, which requires Nationwide Permit 12 activities "to be maintained to ensure public safety," which the Corps interprets to include "maintaining the utility line so that it does not leak." 82 Fed. Reg. at 1892. The Corps also argued that its analysis obligations were limited because it "does not regulate oil and gas pipelines, or other types of pipelines, per se." Nationwide Permit 12 Decision Document at 7 (2017). Ultimately, the Corps told the public that "[c]oncerns regarding pipeline leaks or spills should be brought to the attention of [other] federal agencies." *Id.* at 24.

129.    Courts have recognized the Corps' obligation to evaluate oil spills for individual § 404 permits. *See, e.g., Sierra Club v. Sigler*, 695 F.2d 957, 973 (5th Cir. 1983) (stating "[n]o party can seriously question the importance of the analysis of such an oil spill to this permit decision" in a case dealing with construction of oil terminal and pipeline system). Whether a pipeline is approved by an individual permit or general permit has no bearing on a pipeline's propensity to leak or spill.

130.    The Corps determined that for "utility lines that carry oil or natural gas, reasonably foreseeable future actions also include the burning of fossils fuels, which produce carbon dioxide

that contribute to greenhouse gas emissions." Nationwide Permit 12 Decision Document at 47 (2017). Additionally, the Corps disclosed that "utility line activities authorized by [Nationwide Permit 12] may induce higher rates of energy consumption . . . by making electricity, natural gas, and petroleum products more readily available to consumers. Additional power plants or oil refineries may be needed to meet increases in energy demand." *Id.* at 61. The Corps highlighted the potential beneficial effects of Nationwide Permit 12 on climate change. *Id.* at 9 ("Activities authorized by [Nationwide Permit 12] are currently playing, and will continue to play, an important role in helping the nation achieve goals regarding the increased reliance on clean energy projects to meet the energy needs of its populace, to help reduce emissions of greenhouse gases that contribute to climate change."). But it took the position that, because "the Corps does not have the legal authority to regulate the burning of fossil fuels that are transported by [Corps-approved] pipelines . . . [,] the Corps is not required to fully evaluate the burning of fossil fuels, except to respond to specific comments." *Id.*

131.     The Corps purported to evaluate the cumulative effects of Nationwide Permit 12 based on the "relative contribution" of Nationwide Permit 12 activities to the environmental baseline. *Id.* at 51. However, the Corps determined "it is not possible to quantify the relative contributions of all of the various activities that affect the quantity of wetlands, streams, and other aquatic resources and the functions and services they provide because such data are not available at the national scale." *Id.* at 52. Nonetheless, the Corps concluded that "[d]uring the 5-year period [Nationwide Permit 12] is in effect, the activities it authorizes will result in only a no more than minimal incremental contribution to cumulative effects to wetlands, streams, and other aquatic resources." *Id.*

132.    The Corps also disclosed that thousands of activities authorized under the nationwide permits would affect threatened and endangered species over the life of the permits. *Id.* at 65.

133.    The Corps' EA for Nationwide Permit 12 does not apply the ten intensity factors from 40 C.F.R. § 1508.27(b) (1978).

134.    Several of the intensity factors are implicated for Nationwide Permit 12, including but not limited to: "[i]mpacts that may be both beneficial and adverse" (*id.* § 1508.27(b)(1)); the "degree to which the proposed action affects public health or safety" (*id.* § 1508.27(b)(2)); "[u]nique characteristics of the geographic area" where the activity will take place (*id.* § 1508.27(b)(3)); the "degree to which the effects on the quality of the human environment are likely to be highly controversial" (*id.* § 1508.27(b)(4)); the "degree to which the possible effects on the human environment are highly uncertain" (*id.* § 1508.27(b)(5)); the degree to which the action "represents a decision in principle about a future consideration" (*id.* § 1508.27(b)(6)); and the degree to which the action may adversely affect species protected under the Endangered Species Act (*id.* § 1508.27(b)(9)).

135.    The 2017 Nationwide Permit 12 Decision Document does not discuss environmental justice effects at all. The final rule reissuing the nationwide permits dismisses environmental justice concerns based on the assertion that the nationwide permits as a whole "are not expected to negatively impact *any* community, and therefore are not expected to cause any disproportionately high and adverse impacts to minority or low-income communities." 82 Fed. Reg. at 1983 (emphasis added).

136.    Ultimately, the Corps found the reissuance of Nationwide Permit 12 would not significantly impact the human environment. *Id.* at 1891. The Corps based its FONSI on "the terms

and conditions of [Nationwide Permit 12] and the mitigation measures (e.g., general conditions and other mitigation measures) for [Nationwide Permit 12] activities." *Id.*

137.    According to the Corps, it has no independent obligation to assess compliance with General Conditions—except for General Conditions 18 and 20—once a nationwide permit is issued, including when verifying the application of a nationwide permit to a project in response to a preconstruction notification.

138.    At the time it made its FONSI, the Corps did not know what mitigation measures would be applied to specific projects. "Mitigation requirements . . . [would] be determined by district engineers for activity-specific [nationwide permit] verifications" at a later date. *Id.* at 1890.

139.    The success of any mitigation that is ultimately required is not guaranteed. According to the Corps, it "is difficult to assess whether compensatory mitigation has fully or partially offset the lost functions provided by the aquatic resources that are impacted by permitted activities." Nationwide Permit 12 Decision Document at 71 (2017).

## The Byhalia Pipeline

140.    The Byhalia pipeline is an approximately 50-mile, 24-inch diameter, crude oil pipeline which will connect the Diamond pipeline west of Memphis, Tennessee, to the Capline pipeline east of Memphis. The pipeline developer—Byhalia Pipeline LLC—has not publicly disclosed the ultimate destination and use for the crude oil. The pipeline developer is currently attempting to use eminent domain to acquire private property along the pipeline's route.

141.    A map provided by the pipeline developers is available below and attached as Exhibit 1:



142.    The pipeline route traverses south from the Mississippi River before swinging east and eventually back north to its final endpoint. This circuitous route crosses predominantly Black, low-income neighborhoods in southwest Memphis, including a community known as Boxtown. This neighborhood gets its name from past generations' historic practice of using scraps of wood and metal from nearby train boxcars to build their homes. Although Boxtown was only a few miles from a major metropolitan area, for more than a century after its founding following the Civil War, the residents of Boxtown lived without access to indoor plumbing, sewer lines, electricity, and running water.

143.    In the late 1960s, the city of Memphis annexed Boxtown as part of a broader urban renewal program. Homes that did not meet building codes were condemned, and Boxtown

residents began paying city taxes. Yet as late as 1975, water, sewer, and electricity services had not been provided to many Boxtown homes. After a federal class-action lawsuit was filed over the lack of basic services, the city promised to fund improvements. Following years of further delays, most Boxtown residents finally got access to city services—including water—by the early 1980s. Today, the poverty rate in Shelby County is approximately 19%, but poverty rates in southwest Memphis—including Boxtown—exceed 32%. There are several significant pollution sources in southwest Memphis, including an oil refinery, a steel mill, a retired coal-fired power plant, and a new natural gas plant. The cumulative cancer risk in southwest Memphis is four times the national average.

144.    A representative of the pipeline company identified the route through southwest Memphis and Boxtown as the "point of least resistance." Micaela Watts and Laura Testino, *Memphians Question Plains All American About Route for Proposed Byhalia Connection Pipeline*, The Commercial Appeal (Feb. 15, 2020), Exhibit 2. The same representative acknowledged that when the pipeline company "encountered communities that were newly being built," it "rerouted around them." *Id.*

145.    Memphis is one of the largest metropolitan areas in the world that gets all of its municipal drinking water from an underground aquifer, the Memphis Sand Aquifer. The pipeline will plow through the Davis wellfield near the Boxtown neighborhood. Water is pumped from the Davis wellfield to supply drinking water to areas of southwest Memphis, including Boxtown. The pipeline will cross through a wellhead management area designated by the local drinking water utility under the Tennessee Safe Drinking Water Act to protect the wellfield from potential contamination.

146.    Much of the Memphis Sand Aquifer is protected by a layer of clay between the groundwater and the land surface. Recent studies show the clay layer has several known and suspected breaches, including some near the Davis wellfield and the Byhalia pipeline route. The pipeline also crosses the recharge area for the aquifer—where water from precipitation seeps into the ground refilling the aquifer—for several miles east of Memphis. That area has no protective clay layer to guard against the intrusion of contaminants.

147.    The Byhalia pipeline would cross the jurisdiction of two Corps districts—the Vicksburg and Memphis districts—necessitating Nationwide Permit 12 verifications from each.

148.    On April 17, 2020, Byhalia Pipeline LLC submitted separate preconstruction notifications to the Corps' Vicksburg and Memphis Districts seeking verification under Nationwide Permit 12 for water crossings in each respective district. The preconstruction notifications sent to each district "appl[y] solely" to the water crossings in each respective district.

149.    Days before, in a challenge to the use of the 2017 version of Nationwide Permit 12 for the Keystone XL pipeline, the federal district court for the District of Montana vacated the permit and enjoined its use nationwide based on the Corps' failure to comply with the Endangered Species Act when reissuing the permit. *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp. 3d 985, 996 (D. Mont. 2020), *amended,* 460 F. Supp. 3d 1030 (D. Mont. 2020). The court later limited the vacatur and injunction to only new construction of oil and gas pipelines under Nationwide Permit 12. *N. Plains Res. Council v. U.S. Army Corps of Eng'rs,* 460 F. Supp. 3d 1030, 1049 (D. Mont. 2020). The Corps appealed the Endangered Species Act claims to the Ninth Circuit Court of Appeals, where they are currently pending.

150.   The American Petroleum Institute was an intervenor in the Montana litigation. Plains All American Pipeline, LP is a member of the American Petroleum Institute. Plains All American Pipeline, LP is also a parent company of Byhalia Pipeline LLC.

151.   On June 1, 2020, a Plains All American Pipeline, LP representative wrote the Corps asking, in the context of the Byhalia pipeline: "[A]ssuming we switched to an [individual § 404 permit] process at the end of the week, how long would you envision it would take to pick back up the [Nationwide Permit 12] process and issue a verification should [Nationwide Permit 12] become available again?"

152.   The Corps responded that once it had the information it needed, it could issue Nationwide Permit 12 verifications in "around 30 days or less." However, the Corps also noted that if Byhalia Pipeline LLC "started the [individual § 404 permit] process and some challenging issues/concerns were brought to light as a result of the public interest review (just as an example) . . . we would need to look over the [Nationwide Permit 12] terms/conditions to determine if the project would still meet [Nationwide Permit 12] terms/conditions while considering the issues that arose as a result of the [individual § 404 permit] process." But "[i]f [Nationwide Permit] 12 still works for the project, then we'll certainly switch gears and withdraw the [individual § 404 permit application] to become a [nationwide permit]. If not, then we would have to proceed forward with the [individual § 404 permit] decision."

153.   At the request of the Corps and defendant-intervenors in the Montana litigation, including Plains All American Pipeline, LP through the American Petroleum Institute, on July 6, 2020, the Supreme Court further limited the extent of the district court's injunction and vacatur to apply only to the Keystone XL pipeline but left the remand order and grant of summary judgment

intact. *U.S. Army Corps of Eng'rs v. N. Plains Res. Council*, 141 S. Ct. 190 (2020). The Corps has not complied with the remand order.

154.    Ultimately, Nationwide Permit 12 was reinstated before the Corps initiated the public interest review associated with any individual permit process for the Byhalia pipeline.

155.    On January 25, 2021, the Vicksburg District verified that "[b]ased upon the information furnished [in the Vicksburg preconstruction notice], it appears that Department of the Army permit requirements for the proposed work will be authorized by Nationwide Permit No. 12, as specified in the January 6, 2017 *Federal Register* [Notice]." On February 1, 2021, the Memphis District verified that based on the information provided in the Memphis preconstruction notice, Byhalia Pipeline LLC's "proposed work meets the criteria" of Nationwide Permit 12 "pursuant to the Federal Register [notice] dated January 6, 2017." The Memphis District verification is specific to water crossings in the Memphis District; the Vicksburg verification does not reference any specific crossings at all.

156.    The Corps did not complete any NEPA analysis when verifying the use of Nationwide Permit 12 for the Byhalia pipeline.

157.    Because the project is verified under the 2017 version of Nationwide Permit 12, the only opportunity offered by the Corps for the public to comment on use of Nationwide Permit 12 for the Byhalia pipeline and whether the project was in the public interest occurred between June 1 and August 1, 2016 in association with the eventual 2017 reissuance of Nationwide Permit 12— several years before the Byhalia pipeline was proposed.

158.    Neither verification letter includes an express public interest finding. Nor do they specifically address environmental justice concerns.

159.    Shortly after it issued the verifications, the Corps responded to a letter and telephone inquiries from Congressman Steve Cohen that also raised environmental justice concerns regarding the Byhalia pipeline. Though it did not include a citation, the Corps noted that "[i]n a 1999 memo, EPA has indicated that an agency should evaluate the environmental impact of the proposed action [sic] should consider environmental justice (EJ) when: (a) minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action; and (b) there may exist disproportionately high and adverse human health or environmental effects on minority populations, low-income populations or Indian tribes." Letter from District Commander Zachary L. Miller, U.S. Army Corps of Engineers, to Hon. Steve Cohen, U.S. House of Representatives, (Feb. 5, 2021) [hereinafter "Miller Letter"].

160.    EPA did craft environmental justice guidance with similar language in 1999—however, it only applied to EPA employees conducting Clean Air Act § 309 reviews. *See* U.S. Envtl. Prot. Agency, *Final Guidance for Consideration of Environmental Justice in Clean Air Act 309 Reviews* (1999) [hereinafter "1999 EPA Guidance"]. Contrary to the Corps' characterization, the relevant memorandum section did not proscribe when other agencies "should evaluate" environmental justice impacts, but rather described how EPA reviewers should "rate" the proposed action's environmental justice impact under an EPA-specific policy.

161.    The Corps did not explain why it cited this EPA-specific Clean Air Act memorandum instead of NEPA-specific environmental justice guidance published by CEQ in 1997 that applies to all federal agencies. *See* Council on Envtl. Quality, *Environmental Justice Guidance under the National Environmental Policy Act* (1997) [hereinafter "CEQ Environmental Justice Guidance"]; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 136 (D.D.C. 2017) (noting the Corps' application of CEQ's Environmental Justice Guidance

46

to consideration of environmental justice effects in an EA). CEQ's guidance instructs agencies to consider, among other things, "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards," "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action," and calls on agencies to "develop effective public participation strategies." *See* CEQ Environmental Justice Guidance.

162.     Applying the two-part inquiry from the 1999 EPA Guidance, the Corps proceeded to find that the "socioeconomics and demographics of the [project] area" did support the first prong but "information provided did not support the second prong." Miller Letter at 5. The Corps reached this conclusion despite never soliciting from the public "information" regarding the Byhalia pipeline and environmental justice concerns. The Corps declined to address several specific environmental justice concerns, including the effect of a crude oil spill on southwest Memphis communities, citing its 2017 Nationwide Permit 12 EA for the proposition that though spills are "reasonably foreseeable future actions," the Corps "does not have the authority to address spills or leaks from oil and gas pipelines." *Id.* at 6. The Corps also did not address how the Byhalia pipeline would impact "the potential for multiple or cumulative exposure to human health or environmental hazards" in the southwest Memphis area, or consider other "factors that may amplify the natural and physical environmental effects" of the project, as suggested by CEQ's 1997 guidance. The Corps did acknowledge that had it found an "adverse effect" to an environmental justice community, that would "heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population." *Id.* at 7.

163.     In its response to Rep. Cohen, the Corps also acknowledged its "duty to supplement under the National Environmental Policy Act, where there remains a major Federal action and new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Id.* at 3 (quotation omitted). The Corps took the position that "[preconstruction notification] verifications do not constitute major federal action." *Id.*

164.     On April 23, 2021, Plaintiffs submitted a letter to the Corps pointing out that the Corps has never considered under NEPA the environmental justice effects associated with Nationwide Permit 12 activities. Letter from Amanda Garcia, Southern Environmental Law Center, on behalf of Plaintiffs, to Lt. Gen. Scott Spellman, U.S. Army Corps of Engineers (Apr. 23, 2021). Plaintiffs requested that the Corps supplement its January 2017 EA and mitigated FONSI for Nationwide Permit 12 to account for new information regarding the environmental justice impacts of the Byhalia pipeline and other Nationwide Permit 12 activities. *Id.* The letter explained that major federal action remains to occur with respect to Nationwide Permit 12, regardless of whether the Corps believes that project verifications are major federal actions in their own right. *Id.* at 5. Plaintiffs requested that the Corps respond to the request within two weeks and indicate whether the agency intended to undertake the required analysis. *Id.* The Corps has never responded. On June 7, 2021, Plaintiffs learned that the Corps does not intend to respond.

## Claims for Relief

**Count 1: The Corps' 2017 reissuance of Nationwide Permit 12 violated NEPA, 42 U.S.C. § 4312 *et seq.*, applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706**

165.     Plaintiffs incorporate and restate by reference the allegations of paragraphs 1 through 164 of this Complaint as if set forth in full.

48

166.    The Corps' reissuance of Nationwide Permit 12 is a major federal action that requires compliance with NEPA. 42 U.S.C. § 4332.

167.    The Corps' FONSI for Nationwide Permit 12 was arbitrary and capricious, and fails to make a convincing case that the impact of issuing Nationwide Permit 12 is not significant.

    A.  The Corps failed to apply the intensity factors at 40 C.F.R. § 1508.9(b) (1978), though several indicate that preparation of an EIS is necessary.

    B.  The Corps' "mitigated FONSI" is based on mitigation that is speculative, uncertain to occur, and—by the Corps' own assessment—minimally effective.

    C.  The limited analysis in the Corps' EA indicates effects may be significant, triggering the requirement to prepare an EIS.

    D.  To the extent the Corps is relying on subsequent analysis that is not subject to NEPA to meet its overall NEPA obligations associated with Nationwide Permit 12, it is unlawfully tiering analyses. *See* 40 C.F.R. § 1508.28 (1978).

    E.  By preparing an EA/FONSI rather than an EIS for its Nationwide Permit 12 reissuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

168.    The Corps violated NEPA by failing to take the requisite hard look at the significant direct, indirect, and cumulative environmental effects of reissuing Nationwide Permit 12 (i.e., the impacts of projects authorized by Nationwide Permit 12). *See* 40 C.F.R. §§ 1502.1, 1502.15, 1502.16(a), (b), 1508.9, 1508.25(c) (1978). Among other things, the Corps failed to take a hard look at:

    A.  The risks and impacts from crude oil spills and leaks from pipelines approved by Nationwide Permit 12, including but not limited to spills into municipal

water supplies, spills into jurisdictional waterways, and an examination of the various types of crude oil products transported by Nationwide Permit 12 projects and their respective properties, characteristics, environmental impacts, or spill response requirements;

B.  The climate change impacts of Nationwide Permit 12, including but not limited to the potential for increased life-cycle greenhouse gas emissions resulting from oil and gas pipelines approved by Nationwide Permit 12;

C.  The cumulative effects of Nationwide Permit 12 activities.

169.    For the reasons set forth above, the Corps' reissuance of Nationwide Permit 12 was inconsistent with NEPA and its implementing regulations. The Corps' decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and contrary to the Administrative Procedure Act. *See* 5 U.S.C. § 706.

**Count 2: The Corps' reissuance of Nationwide Permit 12 violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706**

170.    Plaintiffs incorporate and restate by reference the allegations of paragraphs 1 through 164 of this Complaint as if set forth in full.

171.    Section 404(e) of the Clean Water Act constrains the Corps' ability to issue nationwide permits to categories of activities that "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

172.    The Corps must affirmatively find that the category of activity subject to the nationwide permit meets those requirements when it issues the nationwide permit. 40 C.F.R. § 230.7.

173.     Nationwide Permit 12 authorizes the construction and operation of utility lines that do not result in the loss of greater than ½-acre of waters of the United States "for each single and complete project." 82 Fed. Reg. at 1985. But "single and complete project" is defined for linear projects as "all crossings of a single water of the United States (i.e., a single waterbody) *at a specific location*." *Id.* at 2007 (emphasis added). The effect of this definition is to artificially treat each individual water crossing along a linear utility project—which often number in the hundreds or thousands—as a "single and complete project" that qualifies separately under Nationwide Permit 12.

174.     Nationwide Permit 12 includes no limit on the number of individual waterbody crossings that can be approved with Nationwide Permit 12 for an individual project. Nor is there any limit on the total number of acres of waters of the United States that an individual project can impact under Nationwide Permit 12.

175.     The Corps' minimal-effects determination at the Nationwide Permit 12–issuing stage cannot be based on potential future case-by-case mitigation because: 1) many Nationwide Permit 12 activities require no further review after permit issuance; 2) any required mitigation is speculative at the point that Nationwide Permit 12 is issued; and 3) the Corps has no basis for concluding that mitigation successfully minimizes impacts. In fact, the Corps admits that mitigation efforts are often unsuccessful.

176.     When verifying use of Nationwide Permit 12 for projects, the Corps also fails to consider the cumulative effects of multiple water crossings associated with a single project. The Corps also did not consider the cumulative effect of multiple Nationwide Permit 12 projects in a single area when it issued Nationwide Permit 12 in 2017. Nor does the Corps do so when verifying use of Nationwide Permit 12 for specific projects.

177.     The Corps' minimal-effects determination is arbitrary and capricious, in violation of the Clean Water Act, 33 U.S.C. § 1344(e), and the Administrative Procedure Act, 5 U.S.C. § 706.

**Count 3: The Corps' issuance of Nationwide Permit 12 verifications for the Byhalia Pipeline violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706**

178.     Plaintiffs incorporate and restate by reference the allegations of paragraphs 1 through 164 of this Complaint as if set forth in full.

179.     Section 404 permitting decisions are based in part on "the public interest." 33 C.F.R. § 320.4(a)(1). The Corps has codified factors to consider when evaluating the public interest. *See id.* "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case." *Id.*

180.     For activities approved under nationwide permits that require a preconstruction notification, the Corps "will review the notification . . . to ensure . . . that the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal." *Id.* § 330.1(e)(2).

181.     When the Corps determines that a specific activity covered by a nationwide permit "may be contrary to the public interest," the Corps must "either modify the [nationwide permit] authorization to reduce or eliminate the adverse impacts, or notify the prospective permittee that the proposed activity is not authorized by [the nationwide permit]." *Id.* § 330.4(e)(2).

182.     The Corps has acknowledged that the public interest review it typically completes for individual § 404 permits could cause a project to lose eligibility for a nationwide permit.

183.    The Vicksburg District of the Corps verified the availability of Nationwide Permit 12 for the Byhalia pipeline on January 25, 2021. The Memphis District of the Corps verified the availability of Nationwide Permit 12 for the Byhalia pipeline on February 1, 2021. The verification letters are final agency decisions reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 704, 706(2). In the alternative, the verification letters constitute agency actions unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1) in so far as they failed to evaluate the public interest.

184.    Neither verification includes an express public interest determination.

185.    To the extent the Corps made a public interest determination, the Corps' findings regarding environmental justice and the threat posed to the Memphis Sand Aquifer are arbitrary, capricious, and unsupported by the record.

186.    For these reasons, the Corps' verifications for the Byhalia pipeline under Nationwide Permit 12 are unsupported by the record, arbitrary and capricious, and not in accordance with law and must be aside under the Administrative Procedure Act, 5 U.S.C. § 706.

**Count 4: The Corps' continuing failure to supplement its NEPA analysis for Nationwide Permit 12 violates NEPA, 42 U.S.C. § 4312 *et seq.*, applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706**

187.    Plaintiffs incorporate and restate by reference the allegations of paragraphs 1 through 164 of this Complaint as if set forth in full.

188.    Under NEPA, an agency must supplement a previous environmental analysis if agency action remains to occur and "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1978); 40 C.F.R. § 1502.9(d) (2020); 33. C.F.R. § 230.13(b); *Marsh*, 490 U.S. at 374 ("[I]f the new information is sufficient to show that the remaining [major Federal] action

will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental [NEPA analysis] must be prepared.").

189.    The Corps' reissuance of Nationwide Permit 12 is a major federal action that requires compliance with NEPA. 42 U.S.C. § 4332.

190.    Major federal action remains to occur as the Corps continues to use Nationwide Permit 12 to meet its obligations under Section 404 of the Clean Water Act for ongoing projects including the Byhalia Pipeline.

191.    Even after a project receives an initial Nationwide Permit 12 verification (as is the case here), the Corps relies on its "ability . . . to modify, suspend, or revoke [nationwide permits] on a . . . case-by-case basis [as] a key tool for ensuring that the [nationwide permits] only authorize activities that cause no more than minimal individual and cumulative adverse environmental effects." 82 Fed. Reg. at 1864; *see also* 33 C.F.R. §§ 330.1(d) (Corps retains discretionary authority to "suspend, modify, or revoke" nationwide permit authorizations based on numerous factors including the "public interest"), 330.4(e)(2) (providing similar authority), 330.5(d) (detailing the process for suspending, modifying, or revoking authorizations). Restated, the Corps explicitly relies on its discretion to revoke and suspend Nationwide Permit 12 authorizations while project activities are ongoing to substantiate its "minimal effects" finding under the Clean Water Act.

192.    NEPA's requirement to take a "hard look" at environmental effects encompasses environmental justice effects. *See* 42 U.S.C. § 4332; 40 C.F.R § 1508.8 (1978) (defining "effects"); 40 C.F.R § 1508.1(g) (2020) (the same); 40 C.F.R § 1508.14 (1978) (defining "human environment"); 40 C.F.R § 1508.1(m) (2020) (the same).

193.    The Corps has discretion to consider and choose to mitigate adverse environmental justice effects in its Section 404 permitting decisions. The Corps has explained that the presence

of adverse environmental justice effects "heighten[s] agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population." Miller Letter at 7. Consideration of environmental justice effects with other environmental effects could also lead the Corps to prepare an EIS.

194.    When the Corps reissued Nationwide Permit 12 in 2017 it failed to conduct any analysis of environmental justice effects. Instead, it assumed nationwide permits as a whole "are not expected to negatively impact any community, and therefore are not expected to cause any disproportionately high and adverse impacts to minority or low-income communities." 82 Fed. Reg. at 1983.

195.    New information postdating the Corps' 2017 EA and mitigated FONSI for Nationwide Permit 12 shows that the proposed Byhalia pipeline and other projects risks significant environmental justice effects. The Byhalia pipeline will plow through predominantly African American neighborhoods, contribute to cumulative pollution loading in these already overburdened communities including in surface waters, and increase the risk of local water-supply contamination.

196.    Other recent environmental analyses of Nationwide Permit 12 projects—including at least one written by the Corps itself—have acknowledged that such projects do implicate environmental justice concerns. *See* Letter from Amanda Garcia, Southern Environmental Law Center, on behalf of Plaintiffs, to Lt. Gen. Scott Spellmon, U.S. Army Corps of Engineers (April 23, 2021).

197.    Though Plaintiffs have alerted the Corps to this new information and requested that it conduct a supplemental analysis, the Corps has failed to do so.

198.    Because application of Nationwide Permit 12 to the Byhalia pipeline and other projects implicates environmental justice effects "in a significant manner or to a significant extent not already considered" by the Corps' 2017 EA and mitigated FONSI, "a supplemental [NEPA analysis] must be prepared." *Marsh*, 490 U.S. at 374.

199.    Section 706(1) of the Administrative Procedure Act requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs may assert a § 706(1) claim when "an agency fail[s] to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The Corps' continuing failure to supplement its environmental analysis of Nationwide Permit 12 violates the National Environmental Policy Act, 42 U.S.C. § 4332, and must be compelled under the Administrative Procedure Act, 5 U.S.C. § 706(1).

200.    In the alternative, to the extent that the Corps made a decision that supplementing its previous analysis to assess environmental justice effects is not required under NEPA, that decision was arbitrary, capricious, and unsupported by the record, in violation of the National Environmental Policy Act, 42 U.S.C. § 4332, and the Administrative Procedure Act, 5 U.S.C. § 706(2).

**Request for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Declare the Corps' issuance of Nationwide Permit 12 in violation of the Administrative Procedure Act, Clean Water Act, National Environmental Policy Act, and applicable regulations;

b) Declare the Corps' verifications of the availability of Nationwide Permit 12 for the Byhalia pipeline in violation of the Administrative Procedure Act, Clean Water Act, and Nationwide Permit 12, and its terms and conditions;

c) Vacate all Corps verifications and other approvals of the Byhalia pipeline under Nationwide Permit 12;

d) Enjoin the Corps from using Nationwide Permit 12 to authorize construction of the Byhalia pipeline, or otherwise verifying or approving the Byhalia pipeline under Nationwide Permit 12, and enjoin any activities in furtherance of pipeline construction;

e) Award plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

f) Provide for such other relief as the Court deems just and appropriate.

DATE: June 23, 2021

/s/ J. Patrick Hunter

J. Patrick Hunter
N.C. Bar No. 44485
Southern Environmental Law Center
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
828-258-2023
phunter@selcnc.org

Amanda Garcia
TN BPR No. 033773
Southern Environmental Law Center
1033 Demonbreun St., Suite 205
Nashville, TN 27203
615-921-9470
agarcia@selctn.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2021, a true and correct copy of the foregoing

FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

was served via the court's electronic filing system on the following persons:

William L. Penny
Garry K. Grooms
Burr Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
bpenny@burr.com
ggrooms@burr.com

Ann D. Navaro
Brittany M. Pemberton
Bracewell LLP
2001 M Street N.W., Suite 900
Washington, DC 20036
Ann.Navaro@bracewell.com
Brittany.Pemberton@bracewell.com

Leslie M. Hill
U.S. Department of Justice
Environment & Natural Resources Division
4 Constitution Square
150 M Street, N.E., Suite 4.149
Washington, DC 20002
Leslie.hill@usdoj.gov

Devon Lehman McCune
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., S. Terrace, Suite 370
Denver, CO 80202
Devon.mccune@usdoj.gov

/s/ J. Patrick Hunter
J. Patrick Hunter